and J. Stuart Ablon, et al. Whenever you're ready, Counsel. Good morning. If it please the Court, Mark Resnick on behalf of the appellant, Ross Greene. We have three consolidated appeals here. I will divide my argument between all three of them, so I'll be spending a few minutes on each. I'd like to start with the first one, which is Case 13-2294. That is our appeal relative to the defendant, Stuart Ablon, on the copyright issue regarding the work entitled Treating Explosive Kids. And I'd like to focus the Court on the crux of our appeal here, which is that the District Court erred when it found, pre-trial, as a matter of summary judgment, that this work was a joint work for copyright purposes, but not a derivative work. And there are two reasons that the Court's ruling at the summary judgment stage here was error. First and foremost, the issue of whether, under copyright law, this work is a joint work for copyright purposes, meaning each author owns an undivided 100% interest in the work, or a joint work in the sense that both authors' names appear on it and they both contributed to it. But a derivative work as well turns on the question of the intent of the authors at the time the actual manuscript, which was submitted for publication, was created. That question of intent was a jury question, and the District Court improperly resolved it. Counsel, the District Court was careful to exhaustively go through documents. She referred to many documents which, in her mind, reflected the intent of the authors up until the very time that the manuscript was submitted, documents indicating that they were both the authors, that they were jointly responsible for the creation of this document. So she was aware, obviously, of the importance of that intent issue and I think focused on documents because those documents, in her view, did not support the proposition that there was a jury issue here. Yes, and the Court improperly evaluated those factors for the following reasons. There was a lot of confusion here of terminology. Joint work is something that the defendants threw around at trial and in their pretrial papers very, very liberally. And there is a difference between joint work in the sense that both authors created a work and what we are arguing, which is joint work for copyright purposes. The fact that two authors' names appear on a work does not, says nothing about the type of copyright interests they have in that work. There's two possibilities. Joint work for copyright purposes, 100% undivided interest, or joint work created by both, which is also a derivative work, which is what we claim. So to look at it, for example, as the District Court did, a publishing contract which says simply both of them are going to create the work, says nothing about the type of copyright interest conveyed by the authors. To answer that question and to determine the quality and scope of their copyright interest, you must submit the intent issue. Explain to me, please, how in terms of the formal meaning of the words joint and derivative, how could work be both joint and derivative within the meaning of the copyright law? And I say that because, I mean, I understand that in a descriptive sense, this could be characterized as a derivative work, treating the explosive child, because certainly your client wrote the earlier work inescapably. A good deal of that earlier work would be reflected in the later book, and in that sense the later one could be described as derivative of the first work descriptively. But if the work is formally within the meaning of the copyright laws, a work that reflects the intent of the authors that once it comes together in the new book, their work will be indistinguishable, it merges, it is truly their joint creation, how in light of that finding, which the District Court made, how could it at the same time be derivative? That's what I'm struggling to understand. There was no basis for the District Court to find that this was a joint work with both contributions merged into a unitary whole, given the fact... So that's your argument, it was a derivative work, it was never a joint work, it was derivative, is that your position? Yes, sure. Okay. So they can't be both, is that correct? They can't be... In the meaning of the copyright terms, they cannot be both, is that correct? Yes. It's either a joint work where it is a unitary work by intent, where both contributions are merged into a unitary whole, which is what the defense argued, or it is what we say, which is it was intended to be a derivative work where Dr. Green contributes his portion, the lion's share, derived from his earlier work in which he has an exclusive copyright, and the defendant, Ablon, contributes a small portion of original material, essentially standalone in the form of vignettes. There was a hotly disputed fact issue as to both, whether they intended to create a unitary work or a derivative work, lots of evidence from Dr. Green that they intended to... Counsel, before you get too far away from your agreement that they can't be, for purposes of the Copyright Act, both derivative and joint, but Nimmer and the Ninth Circuit say otherwise, right? Well, Nimmer says it can be joint and derivative in the sense that two authors can create a work, but for copyright purposes, in terms of the quality of copyrights they get, it's a derivative work under the Copyright Act. That's how we interpret Nimmers. Okay, thank you. Yes. So the two fact issues, one, the intent. There was a lot of testimony from Dr. Green that the intent was to create a derivative work. There was also testimony from the other side that the intent was to create a joint work. The district court could not act as fact finder, weigh credibility, and decide who to believe. And the evidence on the record was not so overwhelming that they intended to create a joint unitary work that no reasonable fact finder could have found that it was a joint and unitary work. And that point is underscored by what the district court found when it ruled on the summary judgment motion in the first place, which was that it could be derivative or it could not be derivative. A fact finder could find either way. So when the district court ruled its summary judgment initially in September of 2012, it came to that conclusion. Whether it was a derivative work had to go to the jury, and we were happy with that. What happened subsequently was that the district court, in the context of deciding a motion in limine on the eve of trial, decided that, no, it was a joint work, unitary work, not a derivative work. Counsel, in light of what you just said, that as a formal matter within the meaning of the copyright law, a work cannot be both joint and derivative, it seems to me you had no reason for optimism once the court made that summary judgment ruling that this was a joint work. I mean, you should have understood as a legal proposition, even though she may not have fully appreciated at the time, that it followed from that ruling that it could not be a derivative work, which is basically what she said later on the eve of trial, right? I mean, it sounds like she came to that awareness that it could not legally be both. What we believe happened is that the judge improperly acted as a finder of fact and came to that conclusion on the eve of trial. The intent issue should have gone to the jury, which is why this ruling is incorrect, error as a matter of law, and should be reversed. And we should be allowed to submit that issue to the jury, because it's crucial then to the scope of the copyright. Who gets what copyrights in this work? It had great implications for the trial case, for the preliminary injunction motion, which was a permanent injunction, which was denied later on. And we believe it was an error of law, and therefore it should be reversed. I'm happy to answer other questions here, or I'll move on to the next one, which involves our claims on trademark and mass general. With respect to the trademark case as to mass general, we have an entirely separate set of facts and issues. But the main point, the crux of our appeal as to mass general, is that our estoppel defense was not appropriately considered below. Mass general, as you know, deploys a contract argument to say, when Dr. Green signed his employment agreement, those agreements incorporated an intellectual property policy, which transfers the trademarks by operation of contract law to Dr. Green. The case is not about the validity. Our appeal is not about the validity of those contracts. Our case is about whether mass general's behavior, taken in context, and looked at in its totality, was misleading as to Dr. Green, sufficient to cause him to detrimentally rely on that behavior. The detrimental reliance is signing the contracts that they now seek to invoke. If our estoppel defense is correct, mass general, as a matter of law, is stopped from deploying that contract. Counsel, again, this seems to be a case where the court looked at the documents and said that your client executed between nine and 11 employment agreements, which incorporated this intellectual property policy, which he acknowledged he had to read in order to fully understand what he was signing. Basically, the district court's ruling seems to reduce to the proposition that the contract he signed advised him that there was a policy, and if he wanted to know the particulars, he had to read it. And he didn't read it, but the hospital can't be faulted for that. And this is why the context is so important. So let me point out the salient facts that would alter that analysis. It isn't as simple as looking at the four corners of the contract he signed here. As an equitable estoppel allows us to look at the context and the manner in which mass general behaved. When he first signs his employment agreements, making references to be bound to the policies of the hospital, there's no intellectual property policy in effect. That's in 1993. The policies, the contracts, are routinely renewed. So they're sent in inter-office mail that's filled out by someone else with an instruction that says sign and send back. The language in the employment agreement renewals is identical every time, virtually identical every time Dr. Green signs. So this isn't a case where Dr. Green, on his initial contact with the hospital, fails to exercise diligence. The diligence indicates there's no intellectual property policy. That's an undisputed fact. The second time he sent a contract with the exact same language in it, no intellectual property policy, he signs. The issue here is that the state of his knowledge as a result of his diligence is that there's no intellectual property policy. So is it your position that because when he signs his first employment agreement in 1993, the intellectual property policy was not in place, he was entitled to assume in all of those subsequent years, when he signed a contract which required him to read assorted policies, if he wanted to understand them, he was entitled to assume in all those subsequent years that there was still no intellectual property policy in place? Is that the position? Our position is that the question is did Mass. General's conduct toward him give him any reason to believe that the state of his knowledge needed in any way to be updated? And the facts and the context are very clear that the hospital not only did not do that, but did the opposite. So after it adopted the intellectual property policy, which it did in the middle of one of his employment terms, it's undisputed there was no notice to Dr. Green that a policy had been adopted. It's undisputed that the language in the contracts doesn't say policies of the hospitals as amended from time to time. It just says policies of the hospital. So there is no question that the language submitted to him is identical to the language in the contracts when there was no policy in place. It doesn't indicate any possibility of an amendment. There's no external notice to him that a policy has been adopted. And the hospital throughout knows that he is using the trademarks for his private, there's a fact dispute about this, but he's using them for his private non-MGH related activities and is not saying anything, not objecting, no issues whatsoever with what he's doing. And they're just sending him contracts to sign with the same language. Taken as a whole, in equity, is this a representation, is there any reason for him to believe that his knowledge is in some way in need of update? And we submit that under those circumstances here, he did reasonably rely on the conduct of the hospital to his detriment. Now, it requires looking at the hospital's conduct, outside of the four corners of the contract, in total, in light of the fact that when he began, there was no policy. We believe that his reliance was reasonable in light of what was, in total, taken as a whole, misleading conduct by the hospital. It was in sole possession at the time it sent him the renewal documents of the fact that it had adopted a policy. It knew that. He didn't. That the language was the same that it was asking him to sign. It knew that. He didn't. It knew the import of the policy it had adopted on his rights. He didn't. It also knew that he wasn't a lawyer. What was the affirmative misrepresentation by the hospital, upon which your client detrimentally relied? The affirmative misrepresentation. I think, I understand it can be based on conduct, but looking at the conduct of the hospital, how do you divine an affirmative misrepresentation on the part of the hospital? One, number one, by failing to assert any type of ownership interest in the marks after it adopted the policy with knowledge that he was using them in a way that would have been inconsistent with that policy. And in our brief, we have cited email between Dr. Green and the MGH legal department in which it is obvious that they understand that he is conducting non-MGH related activities associated with the trademarks, among other pieces of evidence. And in addition, there's an affirmative act here of sending him a contract which looks exactly like the contracts he signed when there was no IP policy, knowing that there is one. Is that fair? You look at the policies that underline contract law in Massachusetts, implied covenant of good faith and fair dealing. Is this policy in line with what Mass General is doing here to Dr. Green? I would submit it certainly is not. They are the ones who know what they've done. He does not. They give him no indication. In fact, they give him an opposite indication. It's okay with us that you're using these trademarks as though they belong to you. The affirmative conduct, we believe, is established on the record, but it is a representation by conduct. I just have a question about one piece of information that may or may not be in the record. At the point he signed his original contract, the IP policy was not in effect, but there were other policies and procedures. Is there anything in the record, because those would have been incorporated by reference, is there anything in the record suggesting that he read those or knew what they were? It was not a contested issue at trial as to whether he informed himself at the time. I'm having a difficult time. If he never cared about what may have been incorporated by reference, I'm having a difficult time trying to see how a change would have made a difference if he never bothered to determine what other policies may have been applicable to him. Yes, Your Honor, there was testimony at trial that a policy impacting his intellectual property rights would have mattered greatly to him. Off the top of my head, I don't remember the exact testimony about 1993 when he signed the contract. I believe there was testimony that he was aware of the policies and what he was signing. I can't point you to the exact spot in the transcript, and I believe it's referenced in our brief, but I can't point you to that. There was no point at trial as to, you never even read it in 1993, did you? That dialogue never happened, and I think for the purposes of the summary judgment issues, and this was an issue that was decided at summary judgment, so I don't want to invoke what was said at trial. There was, for the purposes of summary judgment, no issue made of the fact that he never looked at the policies in the beginning. So with respect to the estoppel issue here, we believe that in equity, you're allowed to look at the totality of the other side's conduct. Was it reasonable under these circumstances for Dr. Green to assume that his knowledge did not require any updating? We think so, and clearly he changed his position to his detriment, and now he's lost his trademarks as a result. We believe here, it's classic equitable estoppel. We believe that Mass General should be estopped from asserting the ownership right. I will move on now to the appeal by Dr. Ablon of the copyright infringement ruling. Dr. Ablon advances a couple of theories as to why the infringement ruling against him should not stand, and I will address just two aspects. The first one is, he asserts a contract theory, and he evokes the publishing contract and says that because the publishing contract has both of their names on it, they both own the copyright to treating. Well, in some sense, that's correct. They both have their names on the book. They both have some kind of copyright interest in treating, but the publishing contract is silent as to what type of copyright interest that is. Is it a derivative work where each author owns only what he contributed, has copyright interest in only what he contributed, or is it a unitary work? That publishing contract says nothing about that. Secondly, there is an argument that under the copyright statute, treating is a joint work. Well, it's impossible to determine whether there's a unitary whole here if we don't know who contributed what. This goes back to the fact issue of which author contributed what and what was their intention, was it a derivative work or not. I also want to point out, with respect to the contract argument, that the copyright registration certificate here, filed by the publisher, indicates that the publisher owns the copyright to treating explosive kids by operation of contract. The law is that the registration certificate is prima facie proof of the facts that it contains. On the record before the court, the only owner of a copyright in treating explosive kids is the publisher. It certainly is not jointly owned by Avalon and Green as a unitary work. So we don't believe that you can invoke the publishing contract to establish anything as a matter of law. We also don't believe you can say, well, it's a joint work under the copyright act, because you can't determine that until you determine whether or not it is a derivative work. Finally, there's a de minimis copying argument in the appeal of Dr. Avalon, which says, well, it was only 2% of the book that we proved, or a small percentage of the actual text of the book was demonstrated to be infringing. Dr. Avalon only infringed .06% of the book, and therefore it's such a small amount that it's de minimis and not actionable. Here, I would point out that the case law is pretty clear. It's not simply a numeric comparison. Copyright infringement doesn't turn on what percentage of the work somebody took. It looks beyond that to the quality of what was taken. It looks at whether what was taken was core concepts, and in this case, what Dr. Avalon was found to have infringed were key concepts, key pieces of the book. So the numeric argument is not the guiding light here. Finally, they make an argument that, well, since they're joint owners of treating, there's substantial similarity, and again, you can't have substantial similarity unless you determine the joint work, and again, we believe that that issue was improperly decided and needed to go to the jury. Thank you very much for your time. Good morning. May it please the Court, my name is Dennis King, and I represent the appellee, Massachusetts General Hospital, and the appellee cross-appellant, Dr. Stuart Avalon. With the Court's indulgence, I'd like to begin with Mass General's opposition to Dr. Green's appeal, and I'll begin by noting that this case was not tried. It was a summary judgment case. There was reference to trial testimony. There would be no trial testimony relating to these issues because Mass General obtained a summary judgment. Ross Green was a member of Mass General's professional staff for nearly 16 years, from 1993 to 2009. Like other members of the professional staff, his service was not one continuous term, but rather a series of consecutive appointments, generally for two years. The appointment process is spelled out in the bylaws of the professional staff. A candidate submits an application to the chief of service, in this case the chairman of the psychiatry department, who reviews it and approves it, and if approved, he sends it to the general executive committee of the professional staff, where it's again reviewed and approved at that level, and if approved, the candidate is recommended for appointment to the Mass General Board of Trustees. In connection with each application, a candidate fills out an application for appointment. In each application for appointment, the candidate represents that he will abide by all relevant rules, regulations, and policies of Mass General relative to his professional staff. In two of the applications submitted by Dr. Green, in 1996 and 1999, Dr. Green represented not only would he agree to abide by Mass General policies, he would agree to read those policies, and with his signature on those applications goes away any argument he might have to reasonable reliance on any conduct by Mass General, because had he read those policies, he would have read Mass General's 1995 intellectual property policy. When a candidate is appointed, he receives a professional staff appointment form, and in that form it conditions the appointment on the candidate's agreement to abide by all relevant policies of Mass General. Dr. Green accepted ten different appointments during the course of his time at Mass General, and every single one of them he agreed to abide by Mass General's policies. I mentioned the 1995 policy, which was adopted by the Board of Trustees in 1995, and contains provisions as to trademarks. It says trademarks belong to Mass General if they are created by a member of its professional staff during the course of his affiliation with the hospital, or if they are used to describe a product or service originating with or associated with Mass General. After the adoption of that policy, as I pointed out, Dr. Green signed two applications promising he would read Mass General's policies and accepted numerous appointments thereafter saying he would abide by them. In September of 1998, Dr. Green published a book called The Explosive Child, which outlined a treatment method for behaviorally challenged children. That method later became known as a collaborative problem-solving approach, but it was not so represented in that book. In 1999 to 2001, Dr. Green was conducting a study at MGH examining the effectiveness of the model described in The Explosive Child in outpatient populations. In early 2001, Dr. Green coined the collaborative problem-solving mark. He began referring to the method as the collaborative problem-solving approach and the process involved as collaborative problem-solving. Also in 1991, as he was winding down his first study, Dr. Green, also as principal investigator, was commencing yet another study, this time examining the effectiveness of the collaborative problem-solving approach and examining the relative and combined effects of that approach in pharmacotherapy. In July 2002, the Board of Trustees amended its intellectual property policy to add a third circumstance in which it would own trademarks, and that is if the trademarks pertained to significant institutional activities, which was defined as activities that receive direct or indirect financial support from MGH, including funding from any outside source that is administered by MGH. Counsel, excuse me. These facts that you're reciting, there's no dispute about any of this. Isn't that so? I don't believe there is, Your Honor. Right, but I thought the position was that Dr. Green never had reason to understand that by conducting his work in the way that he did, by using MGH facilities, by noting his relationship with MGH, that he would then be giving up his right to ownership of the trademarks that he developed with respect to his own work. I mean, that's really what he's saying, isn't it? In the Mass General brief, we point out many discrepancies in the description of the record in this case. So when my brother says that Mass General was aware of all these activities that he was engaging in outside of Mass General, I caution the Court to look closely at the record because that statement is not supported by the record. But that argument can be dispensed with through the application of four legal principles. The first is that appointment letters such as those provided to Dr. Green are written offers that, if accepted, are the equivalent of an employment contract. And if the letter conditions the appointment on a person's willingness to abide by and promise to abide by the policies of the institution, he can no longer thereafter disavow those policies. The second principle is, under Massachusetts law, unless prohibited by statute of regulation, material can be incorporated into a contract by general reference, something the Court has already noted. And the McDonough case, which is discussed on pages 28 through 30 of our brief, is directly on point. The third principle is that, absent a fiduciary duty or other special relationship of trust, a party to a contract has no obligation to disclose information to the other party to the contract. An employer-employee relationship is an arm's-length relationship. No fiduciary duty exists. Mass General had no obligation to disclose to Dr. Green, particularly where Dr. Green was representing to Mass General, that he was going to read the policies that Mass General was now trying to enforce. And the fourth principle, which the Court has already alluded to as well, is that if someone accepts a written offer without fully acquainting himself with all the terms and provisions, he is nonetheless bound by those terms and provisions. Those four principles are fatal to Dr. Green's argument. But there's also another equitable argument here, and it's estoppel, but not the estoppel that Dr. Green has described to the Court. Dr. Green made a promise to Mass General. He promised he would abide by its policies. He promised he would read those promises. The applications he submitted, by their very nature, are designed to induce reliance, and they did. Dr. Green was appointed on ten separate occasions. And if injustice can only be avoided by enforcing that promise, the promise is binding on Dr. Green. In this case, estoppel is operative, but it's operative against Dr. Green, not in his favor. I'd like to move on to Dr. Ablon, unless the Court has any questions. Well, that last argument that you made, that's not an argument that you made to the Court. The Court did not rely on that notion of estoppel in reaching the decision that it made. Is that correct? It is an argument that we made. I don't recall whether the Court relied on it or not as I stand here today. With respect to Dr. Ablon, there are two aspects to the appeal. The first is Dr. Green objects to the dismissal of count two of his amended complaint, which alleged that Dr. Ablon infringed the copyright in treating explosive kids, a book that was co-authored by the two of them. The problem with that count is that in that very count, Dr. Green alleges that he and Dr. Ablon are co-owners of an undivided interest in the copyrights that work. It is black letter law that a co-owner of an undivided interest in a copyright, which is akin to a tenant in common in real estate law, cannot be sued for infringing that copyright. So as pleaded, count two did not state a claim. The second portion of his argument relates to joint and derivative work, and I would respectfully suggest to the Court that that issue is irrelevant. That is, the issue of whether treating explosive kids is a joint or derivative work as defined in the Copyright Act. In your honor, with respect to loose language, you will note in a footnote in the District Court's summary judgment notion is that she accuses Dr. Green of loosely using the terms joint and derivative. As the Court pointed out, under the Copyright Act, as to two authors, a work cannot be joint and derivative. The only situation, and it's a situation referenced by Judge Howard in Professor Newman's treatise, is where author A writes a book, authors B and C do a derivative work, and agree that as between them, it is a joint work, unitary work. That work as between authors B and C is a joint work, but it is derivative of author A's work. And unless they got author A's permission, then they violated his copyright. That is not the situation here. But in any event, the reason the issue is irrelevant, because as this Court pointed out in its Cambridge Literary Properties case. Well, excuse me. It's not the situation here because A, in your example, participated in the creation. Participated, yes. There's no C. It's A and B. Yeah. A wrote the work, and A and B did the joint work to which A contributed. Right. And that's the distinguishing factor here. But as to the ownership of a copyright, as the Court pointed out in Cambridge Literary Properties, there are three ways that ownership can be established, only one of which involves the Copyright Act. The first is by a contract governed by state law. The second is by operation of state law, such as probate laws. And only if there is neither of those two in operation does one look at the Copyright Act, and that's in cases where ownership is alleged to result from statutory co-authorship. Under those circumstances, the Copyright Act applies. That is not the case here. There was a written contract here between Drs. Green and Avalon as author and their publisher. That contract included a handwritten edit initialed by both Drs. Green and Avalon, stating that the copyright to the work was to be jointly registered in their names. The book was referenced as a single work. There was no reference to a compilation. There was no reference to a derivative work. And if a copyright is registered in two people's names without qualification, each of them owns an undivided interest in that copyright. That's what the contract says. Dr. Green doesn't dispute signing the contract. He doesn't dispute that it says what it says with respect to registration. Rather, he says, while we started out engaging in a work of true joint authorship, the deal changed when I didn't like what Dr. Avalon was producing. On page 13 of his opposition to Dr. Avalon's motion of summary judgment, Dr. Green says, Avalon has failed to show that no other agreement exists which conveyed those rights subsequent to the publishing contract. Well, that's an admission that the rights did exist in the publishing contract. And with all due respect to Dr. Green, the burden is not on Dr. Avalon to produce. Excuse me. I mean, Dr. Green seems to acknowledge they started out intending to create a joint work. The process did not go very well from his point of view, and so he ended up doing most of the work. That's his account. And so by the time they submitted the manuscript, that original intent, they were going to do a joint work, as he would put it, no longer applied. Now, are there nevertheless documents subsequent to the time he says the intent changed that belie that change in intent that actually indicate, despite the problems they had creating the manuscript, that he still viewed it as a joint work? Well, let me first say that that analysis is applying the Copyright Act. So I don't even think that analysis applies because Dr. Avalon's interest in the copyright is established by written agreement. And so you don't even reach the Copyright Act. What you're describing is the, and Mr. Resnick is describing, is the analysis to determine whether something is a joint work under the formal provisions of the Copyright Act. Why did the district court analyze it? The court analyzed it under the Copyright Act. Right. But as this court knows So you're walking away from that favorable analysis? No, I just think there's a much simpler and to the point analysis in that this court can affirm the district court's decision on any basis. And I think the contractual argument on this record is so clear that the court need not even reach that issue. And it just makes the resolution of this appeal so much easier. But to answer the court's question, yes, there are plenty of documents. There are prospectuses which describe it as a joint work. There's the fact that the contract was never amended in that, and coming back to the contract, in order to convey an interest in a copyright, there has to be a writing, there's a statute of frauds in the Copyright Act, signed by Dr. Ablon or his authorized agent conveying the copyright. None exists in this case. The book itself, the copyright designation lists Green and Ablon. No reference to any derivative aspect to the work. The copyright form filed by the publisher, and Mr. Resnick is correct, the publisher, in contravention of the contract, registered the copyright in its own name. That may be prima facie evidence, but it's undisputed that the agreement that the publisher has with the authors, provided that the copyright would be registered jointly in the author's name. That form filed by the publisher in the U.S. Patent and Trademark Office has a box that says, is this a derivative work? If so, describe the derivative aspect. Blank. And neither of the offices, neither of the doctors took issue for years with that designation. No one ever sued the publisher. Nothing of that nature ever happened. So I think on that basis alone, the district court's decision with respect to the ownership of the copyright must be affirmed. Moving on, very quickly to Dr. Let me ask you a question. Let's say, perhaps you can help me here. Say, for example, you have an author of a book. The author of that book then gets together with a playwright and they write a script for a play based on the book. Does the author of the book then lose the copyright protection, vis-a-vis the person that he collaborated with for anything that the playwright, the second person, then draws from the script, from the play script, even if it was clearly drawn directly from the book? The answer to that question is twofold, Your Honor. If there is a contract by which the author and the screenwriter agree that they are going to co-own the copyright, the answer is yes. If there's no written agreement, you apply the Copyright Act, and you get into the question of what was the intent of the parties at the time of the writing of the screenplay. If the intent was to merge the contribution of the first author into the screenplay, which becomes a unitary, interdependent work, then the answer is yes. That whatever has contributed to the screenplay is now co-owned by both of them because each of them own and co-own an undivided interest in the copyright to the subsequent work. Okay, but keep going. And if the intent is that it's solely derivative? If the intent is that it's solely derivative, then each author only has a copyright in the original. It is a derivative work as to the first work, and the authors in the second work have only a copyright in their original contributions to the second work. So that's why you don't get a hybrid. If it's derivative, that kind of covers both scenarios. Correct. Okay. With respect to Dr. Avalon's cross-appeal, it's based on the premise that he is a co-owner of an individual interest in the copyright in Treating Explosive Kids. Dr. Green, it's undisputed Dr. Green owns the copyright in The Explosive Child. In order to prove infringement, he was required to prove that Dr. Avalon copied from that work, and the copying was sufficient to render the PowerPoint slides in which the allegedly copied information was incorporated as a whole was sufficiently similar to The Explosive Child using an ordinary observer test. There was no direct evidence of copying in this case. Dr. Green instead attempted to approve copying indirectly by showing that Dr. Avalon had access to The Explosive Child and that the PowerPoint slides were sufficiently similar to language in The Explosive Child that a fact finder could infer a copy. This court in the Lotus and Holy Transfiguration cases has referred to that type of similarity as provative similarity. This case, I think in this regard, presents a case of first impression. At least we could find no case factually on point. And that is where authors A and B co-author a book that is clearly derivative in a colloquial sense from author A's prior work, but author A and B agree that the copyright in the co-authored work will be owned jointly by the two of them. Staying with that example, the law is clear that author B, as a co-owner of an undivided interest, can exploit the copyright in the subsequent work without fear of an infringement action, subject only to the duty to account for any profits derived from the exploitation. This rule clearly allows author B to use text verbatim from the co-authored work. But I would suggest that in order to proceed without fear of an infringement action by author A, author B must also be able to use language that is provatively similar to language in the co-authored work. That is, language that a fact finder could infer was copied from the co-author's work. Given that the co-authored work in this case, treating explosive kids, was derived in a colloquial sense from the explosive child, the possibility clearly exists that Dr. Ablon could subsequently use language that is probatively similar to language in both the explosive child and treating explosive kids. What I'm suggesting to the court is that that was the case in this case with respect to several of the instances. Well, you probably defended on that basis for the jury, right? Well, I didn't represent Dr. Ablon below, but his counsel dealt with it initially as an evidentiary matter with the court. And then argued that to the jury as well. But I would say this. What I'm suggesting is when language is probatively similar to both books, it loses its probative value as evidence of copying from either book. And that's the basis of the motion for judgment notwithstanding the verdict and motion for a directive verdict. Finally, Your Honor, Dr. Ablon's brief contains a detailed analysis of all six examples of copying. It doesn't lend itself well to oral argument, and I wouldn't rely on my brief to that extent. So unless the court has any other questions, I will conclude. Thank you. Thank you.